May it please the Court, Christy Hughes from Federal Defenders of San Diego, on behalf of Appellant Leticia Galeote, and I'd like to reserve two minutes for rebuttal, please. Okay. March the clock. Your Honors, the first thing the prosecutor did at closing arguments was to yell at the jury, don't you talk to them, you bitch. This was the prosecutor quoting Ms. Galeote's statement that she made while she was in the holding cell when a Border Patrol agent tried to talk to her daughter against her wishes. This prejudicial statement never should have been admitted at trial. It was unfairly prejudicial because it painted Ms. Galeote as the type of person who not only curses a law enforcement officer, but does it in front of her daughter as well. It likely elicited from the jury an emotional response and led the jury to base its decision on this emotion rather than just on the evidence admitted. It sounds like an evidentiary objection, not a constitutional objection. Well, we did, we argue that it should have been suppressed under 403, or I'm sorry, excluded under 403, and we also made the Miranda argument as well, which I can focus on if you want. Well, which are you relying on in what you've just said, the 403? The 403 argument. Okay. That this really had a high likelihood of prejudice given that it involved these curse words, that the Border Patrol agent testified that she was hysterical, screaming, pounding on the door right in front of her daughter, and that this had very low probative value. And when a statement has a low probative value like this, it has to be excluded, even if there is just a modest likelihood of unfair prejudice. And here, I mean, this was very prejudicial, and the statement was very, had very low probative value. First of all, the first district court judge to hear this issue told the parties that he really didn't believe it was relevant, that it was a stretch for the government to argue that it showed consciousness of guilt, that he didn't believe that it went to the elements. Second of all, the Supreme Court stated in Hale that silence in the face of arrest, and by extension, a mother telling her daughter that she can remain silent, is very ambiguous, and that someone could remain silent for any number of reasons. And third, here, Ms. Galeote had a plausible reason for telling her daughter to remain silent. She told the board of trial agents during her interrogation that Ms. Jackson, the friend of her daughter that was outside the holding cell, didn't have her mom around, and that it was a very touchy subject. And so when Officer Moreno started asking Ms. Jackson about her mother, Ms. Galeote knew that was a touchy subject for her. And then she later clarified to probation that Ms. Jackson's mother lives in Mexico. What does touchy mean? Touchy, I think, as she was telling the probation officer, the mother lives in Mexico, is not around much. Her father works two jobs and is also not around much. And Ms. Jackson treats Ms. Galeote's home almost as her second home. And so I think it's hard for her, being a 14-year-old girl, to not have her parents around much. And so when Officer Moreno came up and started asking the girl, you know, where are your parents? Can someone come pick you up? Ms. Galeote had told the officers she doesn't like it when I talk about her mom. It's very sensitive to her that her mom isn't around much. And so I didn't want the officer upsetting her. And that was part of the reason that she had jumped in. Additionally, the government didn't argue harmlessness in its brief, but here they just simply can't meet their burden to show that it's – Could you just do me a favor? Sure. Where in your brief did you argue the 403 basis apart from the constitutional basis? I'm sorry? Where did you argue in your – the Rule 403 basis apart from your constitutional basis? I had focused on the Susie Miranda issue. Page 25 of our brief is our 403 argument. Okay. We separately argued that these were not spontaneous statements, that they were the result of the officers' actions, and that because Ms. Galeote had not been Mirandized yet and Officer Moreno's actions were the functional equivalent of interrogation, these statements should have been suppressed on that basis as well. Here, the officer really should have known that her words were going to provoke this incriminating response from Ms. Galeote. She knew that Ms. Galeote was a mother. She'd just been arrested, accused of having drugs in her car. She's in a very stressful situation, and indeed an adversarial situation, in which Officer Moreno and the other agents are on one side, Ms. Galeote and her daughter and the daughter's friend are essentially on the other. And Officer Moreno comes over and starts asking the girls questions right in front. I thought she was asking. I thought the evidence was that the officer was trying to find out who she could call to get the girls back to adult supervision. She was, and I have two responses to that.  Well, why does it have to be standard procedure? I mean, I'm kind of wondering what should be going on. You've got two juveniles there, and she's approaching. There's a woman agent there who goes over to help them get into adult supervision while the mother or the adult supervisor of the other girl is in custody. So I'm having trouble seeing why that's an impermissible activity. Well, I can represent to the court normally the children are not asked any questions about who can come pick them up. The parent is. I don't care whether it's normal or not. What's the constitutional violation? That she should have known that given the situation, that it was a mother, a very stressful situation, that she doesn't want strangers, especially someone who's just arrested her, and that she doesn't really trust speaking to her daughter, especially when it wasn't necessary. She could have asked her if she wants a Diet Coke or used the bathroom. I mean, I think that's part of the reason. But what did she ask the girls that elicited anything from the girls that was inappropriate? You're saying because this mother misapprehended what the and was suspicious of a Border Patrol agent approaching her daughters that she had to be Mirandized or what? I guess I'm having trouble understanding the dynamic on the ground here. Well, she was under arrest at that point because I was in the holding cell. Right. And before the officer was going to undertake acts that we argue are the functional equivalent of interrogation. I mean, it doesn't really matter exactly if her questions were innocuous, if she was asking about a Diet Coke or a ride home. Really what this Court has said is that you have to look at the interaction from the focus of the suspect in custody. Yeah. And here, I mean, she doesn't know what the officer is asking her. She doesn't know if it's innocuous or not. She doesn't know if she's saying why did you go to Mexico, what's going on with the van. What she should have done is gone to Ms. Gagliotti and said, may I talk to your daughters or the girls and find out. She should have told her before she approached the girls. That's correct, Your Honor. Or in the alternative, if she wants to ask the daughters, the government can't then use Ms. Gagliotti's response at trial. I mean, if they want to ask the children questions in front of the parents to get that information that they feel they need to to get the children home, that's fine. These aren't questions about the incident for which the mother or the woman was put into custody. This was simply questions about their welfare. And as Judge Fischer has indicated, if he said, the person said, do you want to go to the bathroom, would you like some water, those have nothing to do with interrogation. They have nothing to do with the reason that she had been placed into the detention cell. The cases that I, Brett, and I think you're referring to are ones where the parties who are being asked, the children, may have some involvement, be it tangential or more directly involved, in the incident for which the mother or the person was taken into custody. Isn't there a distinction between a circumstance where the child may actually be a part of the act at question versus a humanitarian question of can I take care of you, do you need something? I don't know what you would have them do, lock them in a cell and leave them and don't speak to them or try to be nice and ask them. Isn't there a distinction between the two types of cases? Well, there is. But at this point during the interaction, I mean, first of all, I don't know that it was entirely clear that they didn't believe the girls were involved. I mean, they were pulled out of the car that Ms. Galeote was pulled out of. The drugs were found in that car. So I don't know that at that point they had moved on. Well, you asked them, well, who can we pick you up and take you away, that wouldn't seem to indicate that they thought that they were involved. That's correct. But looking at it from Ms. Galeote's perspective, she doesn't really know what's going on at this point. I mean, they pulled them all out of the same car and now they're starting to talk to the girls. And, again, she doesn't know what's going on. I mean, she's in the cell. Officer Moreno later on moves her farther away. She still has no idea what she's saying to the girls. So, I mean, at that point she doesn't know they could be accusing her daughter of the crime. She really doesn't know. And so from her perspective where, you know, she's a mother, this is her daughter sitting right in front of her, I think that given those special circumstances, which Officer Moreno was aware of, she should have been aware that she was, that Ms. Galeote was especially susceptible to anything that was going to involve her daughter as a mother. Okay. You want to probably move on to one of your other issues because I think we got the point. Okay. I'd also like to address the sentence theme, the minor role issue. Here the district court judge erred in two ways. First, the judge told the parties that she really didn't know what Ms. Galeote's role was in the offense. And this was just false. The judge had just sat there six days of trial, which the judge stated she remembered quite well. The probation officer had informed the judge that Ms. Galeote was working at the behest of Escobedo. I'm sorry. So you're saying the district court lied? Well, I just think that the district court not lied, but made an incorrect finding that she didn't have enough information to find that she didn't know anything about Ms. Galeote's role. Again, there was the six days of trial. There was a wealth of evidence presented that Escobedo was leading this conspiracy and that Ms. Galeote was. I thought the district court said she couldn't see any real distinction between the two. I don't think that was her statement. I think her statement was, I don't really know. She said Escobedo had debriefed the government. I don't know that there's any distinction. I don't see any distinction. She said I didn't recall it. Pardon? I thought she was referring to the quality of what she did recall. It's not here like the judge looked at the facts and then said, I don't find that you qualify for a minor role because you're just as guilty as Escobedo. What the judge said is, well, Escobedo debriefed the government. The government said he spoke to them until they had no further questions. And you didn't debrief the government, so I don't really know what your role was here. And essentially, Ms. Galeote didn't go in, didn't provide the probation officer with her acceptance of responsibility. The probation officer said she couldn't provide an adjustment of role because Ms. Galeote had denied participation and denied knowledge, which is really, I mean, that's a semantic debate right there. What she basically said is she didn't accept responsibility, and so. What's the comparator for minor role adjustment? Is it comparison among the people in the deal or to the average transaction? It's to an average participant. So where's the evidence? Where's your evidence that she was minor compared with the average incident? Well, I mean, there's two things. One is that her co-conspirator, who was the leader of it, was presented by the government as someone entitled to a minor role. I'm sorry. Where's your evidence about the average incident? Well, that was before the court, and the court never made any explanation of why Ms. Galeote was not going to get it. But additionally, there was evidence at trial that she was just a courier, that he had purchased the van, his mother had driven it across the border a number of times. When it broke down, it was towed to his girlfriend's house. I thought our law was just mere courier status doesn't justify the downward departure. It doesn't. But normally in those situations, someone is a courier and they do something else in addition. For instance, in Williams, this court laid out those situations where the courier also participates in a negotiation and the courier also owns a warehouse. Well, I'm just trying to understand. I'm not trying to trap you. I'm just trying to understand. Our law does look beyond the incident to average participants, and I don't find any effort of the defendant to put forward any kind of comparators. So I just don't know. All we're looking at is what she did in this case and what her co-participant did. So is the defendant not capable of producing evidence of the average drug transaction to show how much less involved she was compared to the average? Do you mean right now or her at some time? Not at the time. Well, I mean, I think she was entitled to remain silent throughout the sentencing process, which she did. That's my practical question. How, if the burden is on the defendant to show justification and you're supposed to show that this is less than the average participant, how does one go about doing that? Well, here I think it was a little bit of a unique situation where she, her counsel, argued the facts that were before the court at trial, which was, yes, in relation to her co-conspirator, but then also argued that her co-conspirator was deemed to be less guilty than the average participant because he was receiving this reduction for minor role. So while he didn't necessarily compare her to all average participants, he compared her to her co-conspirator who had already been deemed to be less guilty. Okay. All right. Thank you. Thank you. Good morning. Rebecca Young for the United States. What I'd like to do is just address a couple of the facts that I know that are in the record, just to have those in this record as well. Counsel had stated that Officer Moreno had, that this was, in fact, not standard operating procedure, but, of course, Officer Moreno testified exactly that, that it was, and that's in Volume 2 of the government's SCR, page 291. I think what's also noteworthy is that Officer Moreno did tell the defendant exactly what she had asked those children. When she went, when she first approached Galeote after the pounding on the walls, after the initial bout of screaming, and told her, I'm just trying to get them a ride home. I know, but that's not what, the evidence that you used was what happened before she did that. Right? Right. It happened, the sequence of events is she approaches the children. Screams. Screams. Damaging statement. Used at trial. Then she explains. Then explains, and damaging statements continue. Because at that point, Officer Moreno, because she feels that the defendant is interfering with her attempts to find the children a ride home, takes the defendant down to the last cell at the end of the hall, and the screaming continues. So that entire sequence of events came into evidence during the trial. It wasn't just that that initial outburst was used. It was the entire quantum of statements that she made while in the secondary office, and made to both the children and to Officer Moreno during that particular sequence. Counsel? Yes. Judge Gould with a question, please. So is the Rule 403 issued properly before us? It wasn't. I do understand that counsel cited to a portion of her brief where that was raised. Because 403 is the standard objection that's raised in our trials. But the brief, my perception of the brief was that it focused entirely on the Miranda portion of it, on the constitutional argument, rather than the 403 prejudicial argument. Well, did it raise the 403, and I have to refresh my memory on this, but did it raise the 403 issue in the statement of issues presented? No. And that, you know, I do recall counsel at trial raising that particular objection, raising a 403 objection. And I did actually address it in our brief, because one of the arguments that a public counsel made was that the statements were more prejudicial than probative because they didn't go to an element of the offense. Well, in fact, we argued in our brief that's exactly what they did. They went to showing consciousness of guilt, showing her knowledge, which in cases like these is the only element that is contested at trial, and in fact was the only element truly at issue in this case. It wasn't the ‑‑ I'm sorry. Counsel, did your brief identify Rule 403 in the statement of issues? I did not cite to Rule 403. I just addressed the argument. I'm sorry. Do we have precedent that says if an issue is not raised in the statement of issues of the appellant's brief that we should decline to address it unless the issue is fully covered in the government's brief? That is what this Court does, is decline to address the issue. That is correct. And that's ‑‑ though I do think that if not cited correctly, I do think that the substance of it was addressed in an appellant's brief, which is why the government didn't respond to it. But again, it's ‑‑ the government responded to it because it's what distinguishes this case from the cases cited by counsel. The defendant's outburst was in fact quite probative, and that's always the analysis that you do. And it can't simply be that because it's probative, well, because it's probative, it naturally is prejudicial. But of course, the test is, is it more prejudicial than probative? And in this case, the Court correctly determined that it was not. With respect to minor role, and I know that I've addressed this in the brief as well, but, you know, what the defendant does in this case is essentially wrap herself in the courier cloak and think that, you know, and argues that that somehow is the end of the inquiry. And the district court was exactly right. She simply didn't have the information that she needed to make that determination that an entirely different district court judge did for her co‑conspirator, Mr. Escobedo. And it's ‑‑ I think it's difficult for defense attorneys to balance that. Do I have my client speak to probation, speak to the government, speak in a sentencing when I know that I want to raise issues on appeal? One of the things that you may abandon in that process in keeping your ‑‑ to remain silent throughout the entire proceedings is that the court is not going to have that quantum of evidence. And, again, when it's your burden, when it's the defendant's burden, you've got to bring that forward. But how do you ‑‑ how do defense counsel present an average transact? I know how the government comes in and proves in its affirmative case. We have legions of cases about the use of, you know, border folks, enforcement testifying about the typical structure of drug organizations, so on and so forth. So absent that kind of testimony in from the government, how does the ‑‑ what's the defendant supposed to do other than compare him or herself to the people in the immediate transaction? It's difficult. You know, and it's especially difficult in a case like this where the case expanded exponentially from the initial arrest, where the case agent went out and found that co‑conspirator and found the pattern of crossings and found the phone records that tied those two together. I think there was much more investigative legwork that's done in the typical border bust, and I think that that put the defendant in a much more difficult position to make the minor rule argument. And the district court pointed that out, that this was not a one‑time transaction. There was a pattern and course of conduct, and that was the evidence that was presented at trial. So I think if sentencing, defense counsel was in a tough position. I honestly ‑‑ I don't know what he could have done. I think the best that he could have done would have been to have the defendant come forward. And knowing the district court judges in our district, my personal belief is it would have gone a long way. But, again, you know, these are the strategy calls that counsel has to make, but there are repercussions for that when it's your burden. Okay, I appreciate that. On the invocation, although I know it was argued in the briefs and then we didn't get to counsel's argument, but there are a couple instances where she says, there's one where she says, that's all I'm going to say, I've already told you guys, and then that goes on. And then later on she says, I'm not going to say anything anymore. I've already said what I said and I'm not talking anymore. So what evidence, what came, you know, what turns on invocation, the invocation question, how much evidence was generated after either one of those that wasn't already in evidence through prior statements or before there was an invocation? Well, and as we noted in our, as the government noted in our brief, the defendant's entire statement from beginning to end is anything but a confession. It's denials, it's deflection, it's total misdirection from beginning to end. And in this case, the, those two portions were pursuant to defense counsel's request, purposefully not shown to the jury so that it didn't reflect on the defendant for that exact reason. I think taking the second alleged invocation first, the re-initiation on that particular exchange I think is very clear, which is why less, I devoted less of my brief to that particular passage. The first, the first invocation, and in retrospect, I wish that I had had the district court develop the record better with respect to that particular exchange. But I think from the, from reading the district court's views on it, after having both read the transcript and watched the DVD, that she did not obviously consider it to be a blanket or a general invocation. What it was, and this is what I've been calling it ever since I found that quote in the case, is that the defendant's saying, that's my story and I'm sticking to it. That's what it is. It's nothing like Anderson v. Turcune. And Judge Gould, I know that you were on that en banc panel. It's, it's, it's not what we had in that case, which was repeated, clear, consistent attempts and purposeful police disregard of those repeated attempts to invoke the right to silence. It's nothing what we've got here. It's the defendant's repeated evasiveness, at least with respect to this particular exchange, and the agent simply following up from there. There is just simply no case that comes close to this one, which found that this was an invocation. Thank you. I'll give you some time, a couple of minutes. Okay. I just, I'll respond to the invocation argument since I didn't get to it. First, and the government made this argument in the brief, that this case isn't like Turcune because Ms. Galeote didn't repeatedly invoke her right to remain in silence. That's absolutely not required. Once she says it once and says it clearly, that's enough. The agency is stopped. Okay. Let's assume, let's assume, I would say I have a little trouble with the first invocation. I think the second one is, you know, you're probably right on. But at least that's my view. But what turns on it? In other words, what came in that was harmful that wasn't, wouldn't have been allowable anyway? Actually, a lot. First, she says, she says post the first invocation, which we also, we didn't challenge the second invocation because the district court judge ruled that nothing after that would come in. So she says, well, you know, I know I'm going to be stuck in here a while. I know that they're going to hold me. I know that you're going to have to give me an attorney because I can't afford one, which was likely taken by the jurors as an admission of guilt. I mean, you can take it one way as, well, I know the way the system works. You're not going to let me go. But when she says, I know you have to give me an attorney. I can't afford one. I know you're going to hold me for a while. It sounds and likely sounded to the jury like she's admitting guilt. She also says, when pressed by the agent, she says, well, yeah, now as I'm saying, as I'm telling you my statement, it doesn't really make a lot of sense to me the way I'm telling you, which again the government took at closing argument and ran with it and said, her story is ridiculous. It's crazy. Even she doesn't buy it. And that was the way the government used it. I mean, the government says, well, it wasn't really facially incriminating. It wasn't a confession. But counsel just said, well, her statement was total misdirection from beginning to end. And that's exactly what was argued to the jury. And that's exactly what the court said in Miranda about we don't make distinctions between whether or not a statement is exculpatory or inculpatory. Because the government or the prosecution is going to use this statement to point out little inconsistencies and little untruths and argue guilt by implication that way. And that's exactly what they did and what they continue to do, and just argue the statement had a bunch of junk in it. None of it made sense. And so she's clearly guilty. She's clearly hiding something. She also additionally, the government used post-implication statements to argue that she's holding information back because towards the end of the interrogation, Ms. Galeote says, I don't want you to talk to my daughter. I'm not going to give you my friend's name. I don't want you to look through my cell phone. And the government argued, well, she's clearly hiding something. She's only hiding something because she's guilty. You'll see my time is up. So thank you, Your Honor. Counsel, thank you for the argument. And the case is submitted. And we'll take a 15 minute, 10 minute. Judge Golden. Ten minutes, okay with me. Ten minutes recess. All rise. This court stands in 10 minutes recess.
judges: Fisher, Gould, England